# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:11-cv-1221 |
| | ) | |
| v. | ) | |
| | ) | |
| HARRY NICOLETTI, JR., | ) | |
| MELVIN LOCKETT, in his individual capacity, | ) | Magistrate Judge Lenihan |
| MARTIN KOVACS, in his individual capacity, | ) | |
| JANICE NIEMIEC, in her individual capacity, | ) | |
| JOHN WISER, in his individual capacity, | ) | |
| CORRECTIONS OFFICER BERGER, | ) | |
| In his individual capacity, | ) | |
| CAPT. MOHRING, in his individual capacity, | ) | |
| And SHIRLEY MOORE SMEAL, | ) | |
| | ) | ECF No. 67 & 73 |
| Defendants. | ) | |

## MEMORANDUM OPINION

Presently before the Court in this prisoner civil rights action are two (2) Motions for Summary Judgment. For the reasons discussed below, the Motion for Summary Judgment filed by Plaintiff John Doe ("Plaintiff") against Defendant Harry Nicoletti, Jr. ("Nicoletti") (ECF No. 67) will be granted in part and denied in part. The Motion will be granted as it relates to Plaintiff's Eighth Amendment claims against Defendant Nicoletti, and denied as it relates to the Fourth and Fourteenth Amendment claims.

The Motion for Summary Judgment filed by Defendants Captain Mohring ("Mohring"), Corrections Officer Berger ("Burger")[1], Martin Kovacs ("Kovacs"), Melvin Lockett ("Lockett"),

---

[1] There are two different spellings for Defendant Berger in the record. The Court will use the spelling given by this Defendant in his deposition: "Burger."

Janice Niemiec ("Niemiec"), Shirley Moore Smeal ("Smeal"), and John Wiser ("Wiser") (collectively "DOC Defendants") (ECF No. 73) will be granted in part and denied in part.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Fourth Amendment claims will be granted.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Fourteenth Amendment claims will be granted.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Eighth Amendment claims for failure to protect and failure to supervise will be granted as it relates to Defendants Smeal, Lockett, Niemiec and Kovacs, and denied as to Burger,[2] Wiser, and Mohring.

Finally, the DOC's Motion for Summary Judgment relating to Plaintiff's claim that Defendant Mohring intimidated Plaintiff into withdrawing a grievance will be granted.

## I.   <u>RELEVANT FACTS</u>

The following facts are taken from the parties' Concise Statements of Material Facts, Responses thereto (ECF Nos. 75 & 109), and attached appendices (ECF Nos. 76 & 111), and are undisputed unless otherwise indicated.

### A.   Organization of F Block

The underlying events took place at the State Correctional Institution at Pittsburgh ("SCI-Pittsburgh"), a prison maintained and operated by the DOC.  (ECF Nos. 75 & 109 ¶ 1.)  At this time, SCI-Pittsburgh was operating as a treatment facility and reception center for the western region of Pennsylvania.  (ECF Nos. 75 & 109 ¶ 2.)

SCI-Pittsburgh consists of several housing units including F-Block.  (ECF Nos. 75 & 109 ¶ 3.)  F-Block has five (5) tiers or ranges, with each tier or range having two (2) sides, referred to

---

[2] The DOC Defendants did not move on Plaintiff's claim against Defendant Burger that Burger assaulted him during a cell search on April 22, 2010.  Therefore, this claim against Defendant Burger remains in this civil action.

as Yard Side and River Side. F-Block also contained a control booth and several offices located along the wall opposite the Yard Side tiers. (ECF Nos. 75 & 109 ¶ 4.)

In January of 2009, F-Block was opened to house inmates who were either newly committed to the DOC or parole violators. Only the bottom three tiers or ranges of F-Block were being used to house inmates. (ECF Nos. 75 & 109 ¶ 5.) For the most part, inmates housed on F-Block were transient, with new commits awaiting transfer to DOC's main diagnostic and classification center at the State Correctional Institution at Camp Hill ("SCI-Camp Hill") and parole violators waiting to be returned to their home institutions. (ECF Nos. 75 & 109 ¶ 6.) Upon initial commitment to SCI-Pittsburgh, inmates were medically quarantined, at which time they would be locked down in their respective cells for several days until they were medically cleared. Quarantined inmates remained in their cells at all times, and were provided with meals in their cells. (ECF Nos. 75 & 109 ¶ 7.) Once medically cleared, inmates would be moved to other cells in F-Block. These inmates would remain in F-Block until transferred to SCI-Camp Hill (new commitments) or returned to their home institution (parole violators). These inmates were permitted to leave their cells for meals, scheduled exercise periods in the institution's exercise yards and free time in several common areas in F Block. (ECF Nos. 75 & 109 ¶ 8.)

Inmates on F-Block remained segregated from most General Population inmates at SCI-Pittsburgh. (ECF Nos. 75 & 109 ¶ 9.) Certain inmates on F-Block were designated as block workers and would assist the corrections staff on F-Block with daily maintenance and cleaning, feeding of the quarantined inmates, and other tasks as needed. Being selected as a block worker was considered a reward. (ECF Nos. 75 & 109 ¶ 10.)

The uniformed corrections staff within the DOC followed a chain of command structure, with Major (CO V) at the top, followed in descending order by Captain (CO IV), Lieutenant (CO

III), Sergeant (CO II) and Corrections Officer (CO I).  (ECF Nos. 75 & 109 ¶ 11.)  In 2009 and

2010, F-Block was staffed by several corrections officers assigned to each of three shifts, 6:00

a.m. to 2:00 p.m. (morning); 2:00 p.m. to 10:00 p.m. (afternoon or night) and 10:00 p.m. to 6:00

a.m. (midnight or late).  (ECF Nos. 75 & 109 ¶ 12.)  Typically, two to three Corrections Officers

(CO I) and a Sergeant (CO II) were assigned to F-Block for each shift.  These corrections

officers reported to a Zone Lieutenant (CO III), who in turn reported to a Shift Commander (CO

IV), who were also assigned by shift.  (ECF Nos. 75 & 109 ¶ 13.)  There were also civilian

employees assigned to F-Block during regular daylight hours, including a Unit Manager and a

Counselor, who answered questions and provided information regarding daily routine,

programming, and parole.  (ECF Nos. 75 & 109 ¶ 14.)  Additionally, other staff at SCI-

Pittsburgh worked regular daylight hours.  These included the senior administration at SCI-

Pittsburgh, comprised of the Superintendent, a Deputy Superintendent for Facilities

Management, a Deputy Superintendent for Centralized Services and a Major of the Guard (CO

V).  (ECF Nos. 75 & 109 ¶ 14.)

      B.     The DOC Defendants

Defendant Smeal rose to the position of Executive Deputy Secretary of Corrections by

April of 2010.  Smeal was named as Acting Secretary of Corrections from August of 2010

through January of 2011.  As Executive Deputy Secretary, Smeal oversaw the regional deputy

secretaries and had the responsibility of programming for education, information technology, the

Prison Rape Elimination Act, for county inspections, Office of Psychology, and Bureau of

Community Corrections.  (ECF Nos. 75 & 109 ¶¶ 16-17.)

Defendant Lockett was the Superintendent at SCI-Pittsburgh from October of 2009 until May of 2011. He was responsible for managing and supervising the staff that performed the day-to-day activities required to operate the prison. (ECF Nos. 75 & 109 ¶¶ 18-19.)

Defendant Kovacs was the Deputy Superintendent for Facility Maintenance ("DSFM") at SCI-Pittsburgh from late 2009 through 2011. The DSFM position managed the "security side" of the institution. He was in charge of all the uniformed personnel and would make rounds throughout the institution on a weekly basis. (ECF Nos. 75 & 109 ¶¶ 21-23.)

Defendant Niemiec was the Deputy Superintendent for Centralized Services ("DSCS") in May of 2010, after previously fulfilling those duties in an acting capacity. Niemiec was in charge of several departments at SCI-Pittsburgh, including the drug and alcohol counselors, the religious staff, the inmate records staff and the activities staff, along with the medical staff, the food service staff, education, and psychology. She supervised non-uniformed staff. (ECF Nos. 75 & 109 ¶¶ 24-26.) (ECF Nos. 75 & 109 ¶¶ 18-19.)

Defendant Wiser served as Major of the Guard, which made him fourth in command behind the Superintendent and the two Deputy Superintendents. He reported directly to Defendant Kovacs and described his responsibilities as following up with labor relation grievances, overtime issues, budgets, transportation of inmates, security details at outside facilities such as the local hospitals, and making rounds within the facility. (ECF Nos. 75 & 109 ¶¶ 30-32.)

Defendant Mohring was assigned as the Security Captain at SCI-Pittsburgh in April of 2010. In that position, he supervised the security office and its functions, was in charge of all types of searches in the prison, whether of staff, inmates, drug detection, background checks of

staff, and investigations of staff and inmates. He is still employed by the DOC and he is currently assigned as a Shift Commander at SCI-Pittsburgh. (ECF Nos. 75 & 109 ¶¶ 34-35.)

Defendant Burger was assigned to the Security Department at SCI Pittsburgh in March of 2009. He worked the 6:00 a.m. to 2:00 p.m. shift, with Lieutenant Rohrbacher as the Security Lieutenant and Captain Mohring as the Security Captain and was responsible for all investigations within the institution including staff and inmates. (ECF Nos. 75 & 109 ¶¶ 37-38.)

Defendant Nicoletti was a Corrections Officer (CO I) employed by the DOC and assigned to SCI-Pittsburgh. He was assigned to F-Block on the 2:00 p.m. to 10:00 p.m. shift. On January 5, 2011, Nicoletti was relieved of his duties as a Corrections Officer and escorted off the institutional grounds. (ECF Nos. 75 & 109 ¶¶ 39-40.)

C.       Plaintiff and the alleged abuse

Plaintiff was incarcerated at SCI Pittsburgh in March 2009 as a result of a parole violation and assigned to F-Block. He remained in F-Block until July of 2010 when he was again paroled. He returned to F-Block in August 2010 following another parole violation. He remained on F-Block until December 1, 2010 when he was transferred to the Restricted Housing Unit ("RHU") after being issued a misconduct related to a trash can fire on F-Block. On January 6, 2011, the day after Defendant Nicoletti was removed from his employment, Plaintiff was transferred to SCI-Greensburg. (ECF Nos. 75 & 109 ¶¶ 41-44.)

Defendant Nicoletti selected Plaintiff to be a block worker[3] within a month of arriving on F-Block. In F-Block, there were no set assignments for block workers. Block workers were simply directed by the guards to perform certain tasks. (ECF Nos. 75 & 109 ¶¶ 47-49.)

---

[3] A block worker works under the supervision of the Corrections Officers and does whatever work is required in the housing unit, including cleaning, passing out supplies and assisting with the feeding of the inmates. Block Workers spend a significant amount of their time each day out of their cells. (ECF Nos. 75 & 109 ¶ 47 n.1.)

Plaintiff alleges that after being selected as a block worker, Defendant Nicoletti and other corrections officers on F-Block would direct him to do things to other inmates on F-Block, including verbal assaults, physical assaults and sexual assaults, and sully their food. (ECF Nos. 75 & 109 ¶ 51.) Plaintiff has further alleged that beginning from January of 2010 until June of 2010, he was physically assaulted and sexually abused several times by Nicoletti while he was an inmate on F-Block. Plaintiff indicated that Nicoletti started this physical and sexual abuse after Nicoletti wanted feces smeared and thrown at someone and Plaintiff refused. The next incident with Nicoletti occurred in March of 2010, after Plaintiff again refused to follow Nicoletti's direction during an incident with another inmate. The last incident involving Nicoletti occurred in June of 2010. (ECF Nos. 75 & 109 ¶ 52.) Plaintiff also claims that Defendant Burger physically assaulted Plaintiff during a search of his cell on April 22, 2010. Finally, Plaintiff claims that Defendant Mohring intimidated him into withdrawing the grievance related to this alleged assault. (ECF Nos. 75 & 109 ¶ 53.)

Importantly, Plaintiff admits that he did not tell the moving Defendants of the abuse he endured. Plaintiff also admits that he did not tell anyone at SCI-Greensburg after his transfer about the abuse until he was approached by investigators from the Office of Special Investigations and Intelligence ("OSII"). (ECF Nos. 75 & 109 ¶ 45.) Instead, Plaintiff directs the Court to record evidence in support of his argument that Defendants were aware of the abuse through other sources. (ECF Nos. 75 & 109 ¶¶ 57-61.) Specifically, Plaintiff relies on the following:

1) A January 8, 2014 Report generated by the Department of Justice regarding the conditions of confinement at SCI-Pittsburgh in the wake of the arrest of seven corrections officers for misconduct involving assaults and sexual abuse of vulnerable prisoners. The Report

concluded that the conditions at SCI-Pittsburgh did not violate the Constitution and/or laws of the United States as of that date, and that the institution had used the months since the opening of the investigation to reform what it concluded to be deficient policies and practices at SCI-Pittsburgh.  (ECF No. 111 at 5-20.)

2) Investigative Findings of OSII.  (ECF No. 111 at 22-60.)  This exhibit is a collection of OSII interviews of inmates, corrections officers, a nurse, and an investigative insert concerning the arrest of Defendant Nicoletti.[4]

3) A March 30, 2011 report of OSII investigator Hiler directed to Assistant District Attorney Pittman concluding that DOC staff was not truthful and that there was no collusion between inmates throughout the state who were interviewed.  (ECF No. 111 at 62-63.)  This attachment does not refer directly or indirectly to the named DOC Defendants.

4) Report of interview with CO2 William Chesmer accompanied by various emails which, according to Plaintiff, establish that Defendants and management in Harrisburg were placed on notice of Nicoletti's misconduct by COs Chesmer and Chamberlain as early as 2009.  (ECF No. 111 at 65-75.)

5) Report of OSII Investigator Hiler regarding Major of the Guard Wiser (CO5).  (ECF No. 111 at 78-81.)

6) Deposition excerpts of Defendant Smeal (ECF No. 111 at 83-87), Kovacs (ECF No. 111-1 at 2-8), and Plaintiff (ECF No. 111-1 at 10-20).

7) Report of OSII interview of Defendant Security Captain Mohring (CO4).  (ECF No. 111 at 89-90.)

---

[4] OSII did not formally interview Defendants Smeal, Lockett, Kovacs and Niemiec.  Hiler did, however, request relevant information from Niemiec, which she provided.  Defendants Wiser and Mohring were both interviewed as part of the investigation.  (Hiler Dep., ECF No. 76-12 at 22-25.)

8) OSII Hiler's list of 14 COs who witnessed physical and sexual abuse of prisoners on F block. (ECF No. 111-1 at 75-76). None of these witnesses are the named DOC Defendants.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non- movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

## III.     ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate

that the conduct in the complaint was committed by a person or entity acting under color of state

law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the

Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36

F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a

remedy for violations of those rights created by the United States Constitution or federal law.

*Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

### A.     Motion for Summary Judgment filed by DOC Defendants

First, the Court notes that the DOC Defendants do not move for summary judgment on

Plaintiff's claim that Defendant Burger assaulted him during a cell search on April 22, 2010.

Therefore, this claim against Defendant Burger remains in this civil action.

#### 1.     FOURTH AMENDMENT CLAIMS AGAINST THE DOC DEFENDANTS

The DOC Defendants argue that Plaintiff's Fourth Amendment claims against them must

fail because the Fourth Amendment as it relates to protections against deprivations of liberty

10

does not apply to convicted prisoners. (DOC Defendants Brief in Support of Summary Judgment, ECF No. 74 at 4-5.) Plaintiff does not respond to this argument.

In *Torres v. McLaughlin*, the United States Court of Appeals for the Third Circuit held that post-conviction incarceration is not a Fourth Amendment seizure. 163 F.3d 169, 173-174 (3d Cir. 1998). *See also Donahue v.* Gavin, 280 F.3d 371, 382 (3d Cir. 2002). Therefore, Plaintiff cannot seek redress for injuries sustained during his post-conviction incarceration pursuant to the Fourth Amendment. The Court will grant the DOC Defendants' Motion for Summary Judgment on Plaintiff's Fourth Amendment claim.

2.      <u>FOURTEENTH AMENDMENT CLAIMS AGAINST THE DOC DEFENDANTS</u>

The Fourteenth Amendment has been held to apply to pretrial detainees concerning conditions of confinement claims and affords the same protections offered to convicted persons under Eighth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Here, however, Plaintiff was at all times relevant to the Amended Complaint a convicted prisoner and those Fourteenth Amendment protections do not apply to Plaintiff.

To the extent that Plaintiff attempts to establish a substantive due process claim relating to his conditions of confinement, the explicit source rule prohibits this claim. That is, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Here, the Eighth Amendment provides the explicit textual source for Plaintiff's protection against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 318 (1986). Therefore, the DOC

Defendants are entitled to judgment as a matter of law as to any substantive due process claim relating to Plaintiff's conditions of confinement.

Finally, a careful reading of the Amended Complaint does not reveal that Plaintiff is attempting to invoke the procedural protections of the Fourteenth Amendment Due Process Clause. Therefore, Plaintiff's attempt to establish any Fourteenth Amendment claim relating to his conditions of confinement must fail. The Court will grant the DOC Defendants' Motion for Summary Judgment on Plaintiff's Fourteenth Amendment claim.

3.      EIGHTH AMENDMENT CLAIMS AGAINST THE DOC DEFENDANTS

The DOC Defendants move for summary judgment on Plaintiff's Eighth Amendment claims for failure to protect, and for failure to supervise.

a.      Failure to Protect

This Court has summarized the Eighth Amendment legal standard pertaining to failure to protect in *Jones v. Day,* No. Civ. A. 03-1585, 2007 WL 30195 (W.D. Pa. Jan. 4, 2007), as follows:

> The Eighth Amendment's prohibition against the infliction of cruel and unusual punishment has been interpreted to impose upon prison officials a duty to take reasonable measures "'to protect prisoners from violence at the hands of other prisoners.'" [Hamilton v. Leavy,] 117 F.3d 742, 746 (3d Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Although, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety," "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981)). A plaintiff must prove more than that he had a fight with another inmate, *see Beard v. Lockhart*, 716 F.2d 544, 545 (8th Cir. 1983), and mere negligent conduct that leads to serious injury of a prisoner by a prison does not expose a prison official to liability under § 1983. *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986). To succeed, a prisoner must show that: (1) he was incarcerated

under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. *Farmer*, 511 U.S. at 834-37.

In determining whether a defendant was deliberately indifferent, the court must "focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be). *Hamilton* [], 117 F.3d at 747. It is not an objective test for deliberate indifference; rather, *the court must look to what the prison official actually knew, rather than what a reasonable official in his position should have known.* "A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence." *Id.* In other words, it may be concluded that a prison official knew of a substantial risk from the very fact that the risk was obvious.

. . .

Thus, in order to survive defendants' summary judgment motion, a plaintiff is obligated to produce sufficient evidence to support the inference that defendants "'knowingly and unreasonably disregarded an objectively intolerable risk of harm.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 132 (3d Cir. 2001). It is not enough to assert that a defendant should have recognized the risk; the evidence must be sufficient to support the inference that "the defendant must have recognized the excessive risk and ignored it." *Id.* at 138.

*Jones*, 2007 WL 30195, at *3-4 (emphasis added). Importantly, *Farmer* has been interpreted to apply to assaults on inmates committed by guards. *See, e.g., Farmer*, 511 U.S. at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'")); *Miskovitch v. Lt. Hostoffer*, No. 06-1410, 2010 WL 2404434, at *4 (May 19, 2010) (citing *Farmer*, 511 U.S. at 833 ("[T]he Eighth Amendment requires prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners, as well as at the hands of guards or other state actors.")).

Finally, prison officials may escape liability for deliberate indifference claims in several ways. They "might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure to protect claim. *Id.* at 845; *see also Hamilton*, 117 F.3d at 746.

### Defendant Smeal

Plaintiff comes forward with no evidence to raise an issue of material fact as to whether Defendant Smeal knowingly and unreasonably disregarded an objectively intolerable risk of harm. Plaintiff directs this Court to the 2009 series of emails by COs Chesmer and Chamberlain communicating to the Superintendent of SCI-Pittsburgh, Dawn Chamberlain, about suspected contraband on F Block, including cell phones, a wrist watch, and the presence of inmates in "the Bubble" on F block. (ECF No. 111 at 70-75.) Contrary to Plaintiff's arguments, these emails do not establish that "Management in Harrisburg" and more importantly, Defendant Smeal, "were placed on notice of Nicoletti's misconduct." She was not referenced in the emails or listed as an email recipient.

Record evidence also reflects a letter from Defendant Smeal to Pennsylvania State Representative Dan Deasy dated November 9, 2010 in response to an October 28, 2010 letter from Deasy. Deasy's October letter expressed concern about the alleged April 22, 2010 assault

on Plaintiff by Defendant Burger and the subsequent alleged intimidation of Plaintiff by Captain Mohring to withdraw the grievance. (ECF No. 76-1 at 12-14.) The letter also addresses difficulties experienced by Plaintiff while on parole at two community corrections centers. The exchange of correspondence addresses the alleged assault and the possible introduction of a cell phone. The exchange does not indicate or imply that Smeal had notice of Nicoletti's physical and or sexual abuses on F Block.[5] Plaintiff has failed to come forward with evidence that Defendant Smeal "knowingly and unreasonably disregarded an objectively intolerable risk of harm." *See Beers-Capitol*, 256 F.3d at 132. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Eighth Amendment failure to protect claim relating to Defendant Smeal will be granted.

Defendants Lockett, Kovacs, and Niemiec

Similarly, Plaintiff has failed to come forward with evidence to raise an issue of material fact as to whether Lockett, Kovacs and Niemiec had notice of Nicoletti's abuses and chose to ignore them. Plaintiff argues that the termination of these Defendants provides circumstantial evidence that they must have known about the abuses on F Block. Plaintiff directs the Court to the deposition testimony of Defendant Smeal where she testifies that Lockett and others were removed from their positions "based on the allegations that were brought forward and [] his responsibility and the administrative team's responsibility as superintendent and our belief that we needed to take SCI Pittsburgh in a different direction." (Smeal Dep. ECF No. 111 at 84.) Plaintiff's counsel then rephrased the question during Smeal's deposition, and over objection, Smeal is asked whether Lockett and others were fired "for failing to prevent the abuses." (*Id.*)

---

[5] Smeal's response dated November 9, 2010 was actually drafted by the Department of Corrections' legislative liaison. Consequently, she did not see either letter until November 9, 2010, well after the last alleged incident of abuse in June 2010. (Smeal Dep. ECF No. 73-3 at 24.) It was the legislative liaison's responsibility to conduct the investigation concerning the letter and to draft a response. (ECF No. 73-3 at 25-27.)

Smeal responded "yes." (*Id.*) Lockett, Kovacs and Niemiec's terminations, standing alone, cannot as a matter of law raise an issue of material fact that they knew of Nicoletti's abuses. No reasonable jury could conclude that these Defendants knew of Nicoletti's abuses based upon only the fact that they were replaced. (*See* Smeal Dep. ECF No. 76-3 at 39-40) (Discharge of Lockett, Kovacs, and Niemiec "based on the [abuse] allegations and their role at the facility and their charge of the facility.") (Based on [OSII review] "none . . . had specific knowledge of the abuses.").) *See also* Hoffman Dep. ECF No. 76-20 at 16-17 ("I don't believe Lockett knew." If [Niemiec knew, she would have done something." "[Kovacs] would have absolutely done something.").

In addition to the argument discussed above that this administrative team's termination is circumstantial evidence of their knowledge of Nicoletti's abuses and their deliberate indifference thereto, Plaintiff directs the Court to additional record evidence in an attempt to raise a genuine issue of material fact as to Kovacs and Niemiec. Specifically, Plaintiff argues that Niemiec and Kovac's awareness of the high number of requests for self-lockup emanating for F Block is circumstantial evidence of their notice of abuses on F Block, and their deliberate disregard of the abuses. (Plaintiff's Responsive Brief, ECF No. 110 at 15.) Plaintiff further notes, however, that Niemiec and Kovacs directed Defendant Mohring, Captain of Security, to look into the high number of self-lockups. (*Id.*) As a matter of law, prison officials who actually know of a substantial risk to inmate safety may be found free from liability if they respond reasonably to the risk, even if the harm is not averted. *Farmer*, 511 U.S. at 844.

Here, record evidence reflects that when Niemiec and Kovacs became concerned upon learning of the high number of self-lockups emanating from F Block around August/September 2010, Niemiec notified Lockett in a briefing where Kovacs was also present, and directed her

Security Captain Mohring to investigate.  (Niemiec Dep. ECF No. 76-7 at 38-40; Kovacs Dep., ECF No. 76-6 at 20-22.)  In addition, Niemiec asked the religious and psychological staff to make more of a presence on F Block and talk with the inmates on a more frequent basis.  (*Id.* at 64.)  Niemiec and Kovacs also talked to some of the inmates requesting self-lockup in Program Review Committee reviews and asked what was occurring on F Block—none of these inmates informed them of any concerns.  (*Id.* at 76; Kovacs Dep. ECF No. 76-6 at 20.)  Niemiec testified that thereafter, Mohring reported to her as follows: "[I]t didn't appear as if anything unusual was going on other than these are new commitments coming into the facility, sex offenders having just assumptions about how they may be received and they thought those guys were just taking self-lockup based on their own assumptions."  (Niemiec Dep. ECF No. 76-7 at 40.)  When asked about the type of investigation Mohring did, Niemiec testified as follows:

> His initial reaction to me was you're not used to working at a facility where we have intakes, this is common in a facility with intakes, and I had said no, it's not common.  I was at Greene when we were in the reception center, so I knew your basic numbers of inmates taking lockup, so I said this is more than the usual, *I want you to investigate further.*

(Niemiec Dep. ECF No. 76-7 at 42 (emphasis added).)  Thereafter, OSII had taken over the investigation, and Niemiec went back through all her weekly meeting notes to provide OSII investigators with the sex offenders' names and who had taken self-lockup.  (*Id.* at 40-41.)

Clearly, the efforts of these administrative officials, led by Niemiec and assisted by Kovacs to uncover the problems on F Block, although unsuccessful, do not evidence deliberate indifference.  *See Farmer*, 511 U.S. at 844-45.  No reasonable jury could conclude that record evidence supports Plaintiff's claim that these Defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm.  Therefore, the DOC's Motion for Summary

Judgment on Plaintiff's Eighth Amendment claim for failure to protect against Defendants Lockett, Niemiec and Kovacs will be granted.

Defendants Wiser and Mohring

With regard to Defendants Wiser and Mohring, Plaintiff comes forward with evidence to raise an issue of material fact as to whether these Defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm. Defendant Wiser admits that he was aware of inmates requesting self-lockup for protection, and that most of the requests came from F block. (Memorandum of Interview, Corrections OfficerV, John Wiser, ECF No. 111 at 80.) He further admits that he did not investigate the reason why these requests were made, and "thought nothing of it." (*Id.*) Defendant Kovacs testified, however, that he and Niemiec were concerned about the high number of self-lockups from F Block, and at that point in August/September 2010, Defendant Niemiec directed Captain Mohring to investigate. (Kovacs Dep. ECF No. 111-1 at 6; Niemiec Dep. ECF No. 76-7 at 38-40.) Niemiec noticed a significant spike in the number of sex offenders requesting self-lockup and she wanted to assure herself that the institution wasn't doing anything to put these men at risk. (Niemiec Dep. ECF No. 76-7 at 39.) Kovacs further testified that normally, inmates would not take self-lockup to await transfer but would wait the seven (7) days or other time period to be transferred out because with self-lockup, inmates are only permitted to be outside of their cells for one hour. (Kovacs Dep. ECF No. 111-1 at 6-8.) Captain Mohring indicated to DOC OSII Agents Markel and Barnacle, however, that "he had no reason to suspect a high number of protective custody requests on F [B]lock." (Memorandum of Interview CO4 Gregory Mohring, ECF No. 111 at 89-90.) The response of Kovacs and Niemiec as compared to that of Wiser and Mohring raises an issue of material fact that Wiser and Mohring knew of a substantial risk of harm from the very fact that the risk was

obvious: the spike in requests for self-lockups coming from F Block would alert a corrections official to an obvious risk.  Yet, Defendant Wiser, fourth in command at SCI-Pittsburgh, by his own admission, did nothing to investigate.  Similarly, Captain Mohring, directed to investigate the situation by Niemiec, stated to investigators that he had no reason to suspect a high number of protective custody requests on F Block.  Therefore, Plaintiff has come forward with record evidence to raise an issue of material fact on his Eighth Amendment failure to protect claim and summary judgment will be denied on this issue as it relates to Defendants Wiser and Mohring.

Finally, to the extent that Plaintiff claims that Mohring intimidated Plaintiff into withdrawing a grievance he had filed against Defendant Burger, Defendants' Motion for Summary Judgment will be granted.  "Prisoners do not have a constitutional right to prison grievance procedures."  *See Fears v. Beard*, 532 F. App'x 78, 81 (3d Cir. 2013).

        b.      <u>Supervisory Liability</u>

In order to establish individual supervisory liability[6] against any of the DOC Defendants based on their supervisory positions within the DOC and at SCI-Pittsburgh, a supervisory defendant must have personal involvement in the alleged wrongs; that is, liability cannot be premised on the operation of respondeat superior.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 & n.57 (1978).  Therefore, individual liability can be imposed under § 1983 only if the state official played an "affirmative part" in the alleged misconduct.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986).  The United States Court of Appeals for the Third Circuit discussed the standard for establishing supervisory liability and the requirement of personal involvement as follows:

> We accordingly stated in a § 1983 action that "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v.*

---

[6] No *Monell* claims remain on summary judgment.  (Memorandum Opinion and Order, ECF No. 34 at 16).

> *Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also, e.g.,*
> *Santiago [v. Warminster Twp.]*, 629 F.3d [121,] 129 [(3d Cir.
> 2010)]* ("[The] allegations appear to invoke a theory of liability
> under which 'a supervisor may be personally liable . . . if he or she
> participated in violating the plaintiff's rights, directed others to
> violate them, or, as the person in charge, had knowledge of and
> acquiesced in his subordinates' violations.'" (quoting *A.M. ex rel.*
> *J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d
> Cir. 2004)) (footnote omitted)). "It is also possible to establish [§]
> 1983 supervisory liability by showing a supervisor tolerated past or
> ongoing misbehavior." *Baker v. Monroe [Twp.]*, 50 F.3d 1186,
> 1191 n.3 (3d Cir. 1995) (citing *Stoneking v. Brafford Area Sch.*
> *Dist.*, 882 F.2d 720, 724-25 (3d Cir. 1989)). We further indicated
> that a supervisor may be liable under § 1983 if he or she
> implements a policy or practice that creates an unreasonable risk of
> a constitutional violation on the part of the subordinate and the
> supervisor's failure to change the policy or employ corrective
> practices is a cause of this unconstitutional conduct. *See, e.g.,*
> *Brown v. Muhlenberg [Twp.]*, 269 F.3d 205, 216 (3d Cir. 2001).

*Argueta v. U.S. Immigration & Customs Enforcement*, 643 F.3d 60, 72 (3d Cir. 2011).

As discussed even more specifically by the court of appeals in *Sample v. Diecks*, 885

F.2d 1099 (3d Cir. 1989), "a 'person' is not the 'moving force [behind] the constitutional

violation' of a subordinate, unless that 'person,' . . . has exhibited deliberate indifference to the

plight of the person deprived." *Sample*, 885 F.2d at 1118 (internal citation omitted). The Court

continued that in order to establish supervisory liability, the plaintiff must identify a specific

supervisory practice or procedure that the defendant failed to employ, that the existing custom or

practice without that specific practice or procedure created an unreasonable risk of harm, that

defendant was aware that this unreasonable risk existed, that defendant was indifferent to that

risk, and that plaintiff's harm resulted from defendant's failure to employ that supervisory

practice or procedure. 885 F.2d at 1118. The *Sample* court emphasized that "it is not enough for

a plaintiff to argue that the constitutionally cognizable injury would not have occurred if the

superior had done more than he or she did." *Id.* Rather, a plaintiff must point to specific acts or omissions of the supervisor in the record that evidence deliberate indifference. *Id.*

Here, the DOC Defendants argue that there is absolutely no record evidence to support these theories of individual liability, but that in fact, all record evidence demonstrates that these individual defendants had absolutely no knowledge or awareness of facts or circumstances that would have alerted them to the abuses perpetrated by Defendant Nicoletti.

<u>Defendants Smeal, Lockett, Kovacs and Niemiec</u>

Summary judgment must be granted as to these Defendants for Plaintiff's claims of supervisory liability. As discussed at length above involving the issue of failure to protect, these Defendants had no personal involvement in the alleged abuses of Defendant Nicoletti. That is, Plaintiff comes forward with no evidence to raise a disputed issue of material fact that these abuses occurred at the personal direction of these Defendants, or that these Defendants had actual knowledge of these abuses and acquiesced in them.

Likewise, Plaintiff comes forward with no evidence to raise an issue of material fact that these Defendants were aware that an unreasonable risk existed relating to the alleged deficient policies or procedures identified in the January 8, 2014 Report of the Department of Justice. (ECF No. 111 at 5-20.) Therefore, DOC Defendants' Motion for Summary Judgment as it relates to Plaintiff's claim of supervisory liability of Defendants Smeal, Lockett, Kovacs and Niemiec will be granted.

Therefore, all claims against Defendants Smeal, Lockett, Kovacs and Niemiec will be dismissed with prejudice. Consequently, they will be dismissed as party Defendants.

<u>Defendants Wiser and Mohring</u>

With regard to Defendants Wiser and Mohring, Plaintiff has come forward with evidence to raise an issue of material fact that these Defendants were aware that an inordinate number of inmates from F Block were taking self-lockup for their own protection, failed to take any action to investigate, and thereby acquiesced in the actions of their subordinate, Defendant Nicoletti. Therefore, the DOC's Motion for Summary Judgment on the issue of supervisory liability as it relates to Defendants Wiser and Mohring will be denied.

Therefore, Defendants Wiser and Mohring remain as party Defendants but only as to Plaintiff's Eighth Amendment claims of failure to supervise and failure to protect.[7]

B.      **Motion for Summary Judgment filed by Plaintiff against Defendant Nicoletti**

Plaintiff moves for summary judgment on his Fourth, Fourteenth, and Eighth Amendment claims against Defendant Nicoletti (ECF No. 67). As discussed at length, *supra*, at section III.A.1. & 2., Plaintiff cannot recover pursuant to the Fourth and Fourteenth Amendments. Therefore, Plaintiff's Motion for Summary Judgment on these claims must be denied.

With regard to his Eighth Amendment claim, however, Plaintiff alleges that he was physically and sexually abused while an inmate at SCI-Pittsburgh by Defendant Nicoletti. The Court takes judicial notice of the fact that Defendant Nicoletti was convicted after a jury trial in the Court of Common Pleas of Allegheny County, Criminal Division, of indecent exposure, official oppression and criminal solicitation to commit simple assault. (ECF No. 111-1 at 23-25.) In his responsive brief to Plaintiff's Motion for Summary Judgment as to Defendant Nicoletti (ECF No. 112), Defendant Nicoletti states that he advised his counsel not to file a

---

[7] Defendant Burger, who did not move on the Eighth Amendment claims, also remains as a party Defendant on these claims.

response to Plaintiff's Motion for Summary Judgment and indicated that the Court decide the Motion based solely on the pleadings.

Therefore, after a review of the pleadings and record evidence, the Court will grant Plaintiff's Motion for Summary Judgment against Defendant Nicoletti for violation of Plaintiff's Eighth Amendment rights. The Fourth and Fourteenth Amendment claims against Defendant Nicoletti will be dismissed with prejudice.

CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment filed by Plaintiff John Doe against Defendant Harry Nicoletti, Jr. (ECF No. 67) will be granted in part and denied in part. The Motion will be granted as it relates to Plaintiff's Eighth Amendment claims against Defendant Nicoletti, and denied as it relates to the Fourth and Fourteenth Amendment claims. All other claims (Fourth and Fourteenth Amendment claims) against Defendant Nicoletti will be dismissed with prejudice.

The Motion for Summary Judgment filed by Defendants Mohring, Burger, Kovacs, Lockett, Niemiec, Smeal, and Wiser ("DOC Defendants") (ECF No. 73) will be granted in part and denied in part.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Fourth Amendment claims will be granted.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Fourteenth Amendment claims will be granted.

The Motion for Summary Judgment by all DOC Defendants as to Plaintiff's Eighth Amendment claims for failure to protect and failure to supervise will be granted as it relates to Defendants Smeal, Lockett, Niemiec and Kovacs, and denied as to Burger, Wiser, and Mohring.

Finally, the DOC's Motion for Summary Judgment relating to Plaintiff's claim that Defendant Mohring intimidated Plaintiff into withdrawing a grievance will be granted.

Therefore, Defendants Smeal, Lockett, Niemiec and Kovacs will be dismissed as party Defendants. Defendants Burger, Wiser, and Mohring remain as party Defendants but only as to the Eighth Amendment claims of failure to protect and failure to supervise.

An appropriate Order will follow.

Dated: November 16, 2018                         BY THE COURT


                                                 s/Lisa Pupo Lenihan
                                                 LISA PUPO LENIHAN
                                                 United States Magistrate Judge